UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| E. COOK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:20-cv-00049-JMS-MJD |
| ) | |
| PAUL TALBOT, ) | |
| WEXFORD HEALTH SERVICES, ) | |
| ) | |
| Defendants. ) | |

**ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

For the reasons explained in this Entry, the defendants' motion for summary judgment, dkt. [35], is **granted.**

## I.  Background

Indiana prisoner Edward Cook, at all relevant times confined at the Pendleton Correctional Facility ("Pendleton"), brings this 42 U.S.C. § 1983 civil rights action against Dr. Paul Talbot and Wexford Health Services ("Wexford"). The defendants' motion for summary judgment is ripe for resolution.

Mr. Cook alleges that Dr. Talbot was deliberately indifferent to his dry skin condition by refusing to provide him treatment, causing Mr. Cook unnecessary pain and other discomfort. He further alleges that Wexford hired Dr. Talbot knowing that he would not properly treat Mr. Cook and because it has a policy of not treating inmates to save money and earn more profits. Dkt. 8 (Screening Entry).

1

## II.  Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown,* 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 628 (7th Cir. 2018). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Johnson v. Advocate Health and Hosps. Corp.* 892 F.3d 887, 893 (7th Cir. 2018).

## III.  Discussion

### A. Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

Mr. Cook has been diagnosed with xerosis cutis, a medical term for dry skin. Dkt. 37-1, ¶

5 (Dr. Talbot Affidavit).[1] Mr. Cook's dry skin was worse in the winter and would cause him painful itchiness and sometimes it would crack and bleed. Dkt. 37-2 at 10 (Cook Dep. 34:22-35:9).

Standard treatment for xerosis cutis is typically at-home care using moisturizers. Dkt. 37-1, ¶ 5. Other ways to treat xerosis cutis include avoiding forced heat, taking lukewarm baths or showers, and drinking plenty of water. *Id.* More extensive treatment may be warranted if a patient experiences skin that is oozing, a ring-shaped rash, if the skin is getting much worse even with treatment, or if an infection develops. *Id.*

During times relevant to his complaint, Mr. Cook was enrolled in the prison chronic care clinic. Dkt. 37-2 at 9 (Dep. 32:4-6). As such, he was scheduled to see a provider regularly. *Id.* at 32:7-14.

Dr. Talbot, a physician, was employed to provide medical services at Pendleton at all relevant times. Dkt. 37-1, ¶ 2. When Dr. Talbot first saw Mr. Cook on May 25, 2017, for chronic care, Cook said that his xerosis cutis was diagnosed by a biopsy eight years earlier and he used Theraderm for his condition. Dkt. 37-1, ¶ 6; dkt. 37-3 at 7. Theraderm had been prescribed by a previous provider at the prison, beginning in March 2017. Dkt. 42-1 at 10, 13. Theraderm lotion is a non-formulary medication requiring the approval of the Regional Medical Director for use. Dkt. 37-1, ¶¶ 8, 23. Dr. Talbot's examination revealed no clear indication for renewal of Theraderm lotion because Mr. Cook simply had mild dry skin. *Id.,* ¶ 6. There were no wounds, no drainage, and no skin lesions. *Id.* As such, Dr. Talbot counselled Mr. Cook to drink more water. *Id.*

At a July 13, 2017, provider visit, Mr. Cook brought in a ¾ full bottle of Theraderm lotion, wanting a refill. *Id.,* ¶ 7. Dr. Talbot's examination revealed that Mr. Cook's skin was not dry,

---

[1] *See also* https://www.healthline.com ("Xerosis cutis is the medical term for abnormally dry skin."); https://www.wederm.com/patient-library/xerosis-cutis ("Xerosis cutis is the medical term for abnormally dry skin. It is a common condition, particularly in the elderly.").

indicating no need for a refill of Theraderm lotion. *Id*.

At a chronic care visit on September 14, 2017 Dr. Talbot noted that Mr. Cook had dry scaling dermatitis mainly on his extremities. *Id.*, ¶ 8. Dr. Talbot, ordered Theraderm, by submitting a formulary exception request the same day noting the reason for the request was due to moderately severe xerosis cutis. *Id*.; dkt. 37-3 at 14-19.  The stop date on the Theraderm was December 12, 2017. Dkt. 37-3 at 19.

When Mr. Cook saw a nurse practitioner in November 2017, she noted that his skin was mildly dry with cracking. Dkt. 37-1, ¶ 9; dkt. 37-3 at 21. The nurse practitioner saw Mr. Cook again on December 12, 2017. Dkt. 37-1, ¶ 10; dkt. 37-3 at 26. She noted that his skin was dry, scaly, and cracked on both extremities. *Id.* She submitted a non-formulary request to refill the Theraderm beyond the December 12 order. Dkt. 37-1, ¶ 10; dkt. 37-3 at 24. The prescription for Theraderm was not approved "by Corporate," however, so the nursing staff told Mr. Cook he must use commissary lotion. Dkt. 37-1, ¶ 11; dkt. 37-3 at 29; dkt. 42-1 at 25-30.

When Mr. Cook saw nursing staff on January 12, 2018, he said that he had used all lotions available on commissary and they did not work for his dry skin. Dkt. 37-1, ¶ 12; dkt. 37-3 at 30-32.  As a result, Dr. Talbot saw Mr. Cook on January 17, 2018. Dkt. 37-1, ¶ 13. Mr. Cook brought an empty bottle of cocoa butter lotion to this visit and said that it did not work. Upon examination, Dr. Talbot determined that Mr. Cook had only mild dry skin. Dkt. 37-1, ¶ 13; dkt. 37-3 at 33-34. Accordingly, Dr. Talbot counselled him to drink more fluids, not to over-soap, not to stay too long in the shower, and to apply commissary lotion immediately after showering. Dkt. 37-1, ¶ 13; dkt. 37-3 at 33. He was advised to get creams or ointments from commissary as there was no clinical indication for prescription lotion at that time. Dkt. 37-1, ¶ 13

On January 25, 2018, Mr. Cook saw nursing staff and again complained that he had used

every commissary lotion available, but nothing worked. Dkt. 37-3 at 36. Nursing staff examined him and noted pruritic, peeling, cracking of the skin and white scales but no evidence of infection. *Id.* at 37. Mr. Cook reported he had used lotions with aloe and cocoa butter, medicated skin cream, lotion packets, and hypoallergenic lotion from commissary and none worked. *Id.* at 38. He testified in his deposition that during the worst winter months when he tried to exercise, he experienced pain in his legs due to cracking skin. Dkt. 37-2 at 6 (Dep. 21:5-25).

Mr. Cook was referred to a nurse practitioner who saw him on February 2, 2018. Dkt. 37-1, ¶ 16; dkt. 37-3 at 39-41. Her physical examination revealed that his lower extremities were dry with the soles of his feet peeling. *Id.* His skin on his legs was dry with cracks but there was zero evidence of any recent use of lotion. *Id.* She told Cook that he needed to try the medicated skin cream in commissary, as they had the same ingredients as Eucerin cream. *Id.*

Mr. Cook's commissary order receipts from May 2017 until January 2018 show that, contrary to what he had been instructed to do and what he reported to nursing staff, the only lotion he purchased from commissary was cocoa butter on August 21, 2017. Dkt. 37-1, ¶ 15; dkt 37-4; dkt. 42-1 at 32. Mr. Cook also bought one bottle of hypoallergenic lotion on February 5, 2018. Dkt. 37-1, ¶ 24.

Mr. Cook did not see medical staff again for skin complaints for almost a year, when he saw the nurse practitioner on January 6, 2019. Dkt. 37-1, ¶¶ 17-18; dkt. 37-3 at 1-3. At this visit, he requested cream or lotion for his dry skin and stated that he could not purchase commissary. Dkt. 37-1, ¶ 18; dkt. 37-3 at 1. The nurse practitioner noted his skin had a mild amount of dryness, but no cracking or open sores were observed. Dkt. 37-1, ¶ 18; dkt. 37-3 at 3. As such, he was informed that he should reduce time in hot showers. Dkt. 37-3 at 1.

Dr. Talbot next saw Mr. Cook on January 31, 2019. Dkt. 37-1 at ¶ 19; dkt. 37-3 at 4-6. His examination revealed mild dry skin on his trunk, legs, and eyelid. *Id.* Dr. Talbot again counselled

5

Cook to drink plenty of fluids, not to over-shower or over-soap, and to obtain commissary creams to apply immediately as needed. *Id.* He also submitted a formulary exception request for Minerin lotion. *Id.*

Mr. Cook did not voice any complaints about his skin at any of his chronic care or provider visits on March 26, May 7, July 30, or August 15, 2019. Dkt. 37-1, ¶ 20. On September 3, 2019, Dr. Talbot noted that Cook's only visible skin issue was moderately dry skin mainly on his legs, but no wounds and no drainage. Dkt. 37-1, ¶ 21; dkt. 37-3 at 60. However, due to Cook's request for Theraderm, Dr. Talbot submitted another formulary exception request for the lotion. *Id.*

At their next and final encounter on September 10, 2019, Dr. Talbot informed Mr. Cook that the request was not approved, and Cook was instructed to obtain creams from commissary as needed. Dkt. 37-1, ¶ 22.[2]

It is Dr. Talbot's opinion that Mr. Cook's dry skin was a common, non-serious condition that could be treated with medicated skin creams or other lotions on commissary. *Id.*, ¶ 24. Mr. Cook's dry skin never revealed any wounds, drainage, or infections warranting more extensive treatment. *Id.*, ¶ 25.

Dr. Talbot also believes that because Mr. Cook failed to try other medicated lotions from commissary, with the exception of cocoa butter in March 2017 and hypoallergenic lotion in February 2018, it is difficult to determine whether other lotions did in fact help alleviate his symptoms of moderately dry skin. *Id.*, ¶ 24.

Dr. Talbot has never been told to deny any patient necessary medical care to save money. *Id.*, ¶ 27. Dr. Talbot is not aware of any policy regarding denying medications or lotions to save

---

[2] Medical records associated with this final appointment cited by the defendants with Bates numbers 01003-01006 are not in the record. Nonetheless, Mr. Cook does not dispute Dr. Talbot's description of this appointment.

money. *Id.*

It is Mr. Cook's personal opinion that Wexford hired Dr. Talbot knowing he had been negligent or deliberately indifferent when he worked for Corizon. Dkt. 37-2 at 19 (Dep. 71:7-16). Mr. Cook has not seen any Wexford policy or document that said it had a practice of trying to save money. *Id.* at 71:21-72:2.

### B.     Analysis

Mr. Cook argues that Dr. Talbot was deliberately indifferent to his serious medical condition of dry skin. Specifically, Cook contends that Dr. Talbot refused to prescribe Theraderm lotion or provide any treatment for his skin condition. Dkt. 8 at 2 (Screening Entry).[3] He further alleges that Wexford hired Dr. Talbot knowing he would not properly treat Mr. Cook and it has policies of not treating inmates to save money and earn more profits. *Id.*

At all relevant times, Mr. Cook was a convicted offender. This means that the Eighth Amendment applies to his deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v.*

---

[3] In his response to the motion for summary judgment, Mr. Cook contends that Dr. Talbot also failed to address his toenail infection. There were no factual allegations of issues with a toenail infection in the complaint, and such a claim cannot be added at this stage of the litigation. *See Whitaker v. Milwaukee Cty., Wisconsin*, 772 F.3d 802, 808 (7th Cir. 2014) (describing cases affirming district courts' refusal to consider new claims based on factual allegations that plaintiff raised for first time in response to motion for summary judgment). Moreover, the only claim allowed to proceed at screening was a deliberate indifference claim relating to a severe skin condition. Dkt. 8 at 3.

7

*Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011).

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). The subjective standard "requires more than negligence and approaches intentional wrongdoing." *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (internal quotation omitted). Even a showing of medical malpractice is not sufficient. *Id.* "Rather, the evidence must show that the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.*

### 1. Claim Against Dr. Talbot

Dr. Talbot first argues that Mr. Cook's dry skin condition was not an objectively serious medical condition. Mr. Cook concedes that his dry skin was worse in the winter, but he contends without supporting evidence that "[x]erosis cutis is not the medical term for dry skin." Dkt. 41 at 3, ¶ 10. The Court accepts Dr. Talbot's definition of xerosis cutis as dry skin. For purposes of the motion for summary judgment only, however, the Court will assume that Mr. Cook's dry skin was, at least at times, a serious medical condition.

There were many months that Mr. Cook did not complain about dry skin. When he did present such complaints, Dr. Talbot examined his skin. When it appeared to be normal or only mildly dry, he counseled Cook on various ways to lessen the dryness. Dr. Talbot suggested buying medicated lotions from commissary, drinking more water, not staying in a hot shower too long, and not using a lot of soap. Mr. Cook does not dispute that he often failed to try other medicated lotions. When Mr. Cook's skin appeared more dry or scaly, Dr. Talbot sought approvals for Theraderm or Minerin lotions. Theraderm and Minerin could only be provided if Dr. Talbot's

8

requests were approved by the Regional Medical Director. These varying circumstances demonstrate that Dr. Talbot exercised his professional judgment by responding with treatment appropriate for the symptoms presented at each visit. *See Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 660 (7th Cir. 2021) (To show deliberate indifference, a [p]laintiff must show a failure to exercise medical judgment at all.").

As noted, the standard for deliberate indifference is extremely high, requiring a showing of even more than gross negligence or malpractice. *Goodloe*, 47 F.3d at 1030. Mr. Cook has made no such showing.

"A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Id.* (internal quotation omitted). The only evidence of the standard of care is that presented by Dr. Talbot. Mr. Cook has failed to present admissible evidence demonstrating that no competent physician would make Dr. Talbot's treatment decisions and recommendations. Indeed, those treatment decisions sometimes included requests for Theraderm. Dr. Talbot's approach to treating Mr. Cook's dry skin is entitled to deference.

Mr. Cook often asked for Theraderm lotion, and it was not always provided. Sometimes the providers, including Dr. Talbot, did not believe it was necessary and other times Dr. Talbot's requests for approval were denied. Nonetheless, a [d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409. In addition, "an inmate is not entitled to demand specific care and is not entitled to the best care possible…." *Arnett,* 658 F.3d at 754. Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm." *Id.* This is a case in which the plaintiff demanded very specific

9

care with which the medical providers, including Dr. Talbot, did not always agree was necessary. This is not sufficient to defeat summary judgment.

Mr. Cook also argues that Dr. Talbot ignored the fact that he had already been approved for Theraderm. The prescription that had been ordered and approved before Dr. Talbot saw Cook, however, was not for an indefinite time period. The Seventh Circuit has held that "the prison physician, as the inmate's acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). Mr. Cook has failed to dispute with evidence other than his own lay opinion that Dr. Talbot complied with the accepted standard of care for moderately, at times, dry skin. Although Cook has demonstrated that providers who treated him in 2020 prescribed Theraderm lotion, dkt. 42-1 at 13, this does not create a genuine issue of material fact as to whether Dr. Talbot was deliberately indifferent to Cook's skin condition when he treated him. It is possible that the condition of Cook's dry skin was more severe when he was seen by other providers in 2020. Moreover, as noted above, a difference in opinion between doctors does not alone support a deliberate indifference claim.

The record is undisputed that Dr. Talbot exercised his medical judgment and provided a reasonable course of treatment for Mr. Cook's dry skin condition. There is no designated evidence showing that Dr. Talbot disregarded a substantial risk of harm to Mr. Cook's health. Accordingly, Dr. Talbot is entitled to summary judgment.

### 2. Claim Against Wexford

With respect to Mr. Cook's policy and custom claim against Wexford, Mr. Cook has presented no admissible evidence supporting his personal opinions that Wexford hired Dr. Talbot

knowing he had a history of being negligent and that Wexford had a policy or custom of denying treatment due to financial reasons. Dkt. 37-2 at 19: 70:4-72:12. Without such evidence, no reasonable jury could find that Wexford had a policy that caused any denial of necessary treatment to Mr. Cook. *See Thomas v. Martija*, 991 F.3d 763, 774 (7th Cir. 2021) (affirming grant of summary judgment in favor of Wexford where plaintiff presented no evidence of a policy not to provide coordinated care).

### IV. Conclusion

For the reasons discussed above, the defendants' motion for summary judgment, dkt. [35], is **granted.** Judgment consistent with this Entry and with the screening Entry of February 28, 2020, dkt. [8], shall now issue.

IT IS SO ORDERED.

Date: 5/20/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

E. COOK
998849
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Erika Lauren Steuerwald
KATZ  KORIN CUNNINGHAM, P.C.
esteuerwald@kkclegal.com

11